1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LARRY HINES,

11              Petitioner,              No. CIV S-08-CV-1415 GEB CHS P

12        vs.

13   D.K. SISTO[1],

14              Respondent.        <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16                         **I.  INTRODUCTION**

17              Petitioner, Larry Hines, is a state prisoner proceeding pro se with a petition for writ

18   of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving an indeterminate

19   sentence of thirty-six years to life following his 1981 guilty plea to forcible rape with a penalty

20   enhancement for use of a deadly weapon and his 1982 jury conviction for first degree murder with

21   penalty enhancements for use of a deadly weapon and a prior violent felony conviction.  Here,

22   Petitioner does not challenge the constitutionality of his convictions, but rather, the execution of his

23   sentence, and specifically, the February 14, 2007 decision by the Board of Parole Hearings (the

24   _____

25         [1] Gary Swarthout is substituted for his predecessor, D.K. Sisto, as the current acting warden
26   at California State Prison, Solano, where Petitioner is currently incarcerated, pursuant to Fed. R. Civ.
     P. 25(d).

                                   1

1   "Board") finding him unsuitable for parole.

2                           **II.  ISSUES PRESENTED**

3          Petitioner alleges two grounds for relief in his pending petition.   Specifically,

4   Petitioner's claims are as follows:

5          (1)      The Board of Parole Hearings' decision to delay setting
                    Petitioner's parole release date was not supported by any
6                   relevant, reliable evidence in the record that he currently
                    poses an unreasonable risk of danger to society and was
7                   arbitrary, in violation of Petitioner's right to due process of
                    law under the Fifth and Fourteenth Amendments.
8
           (2)      The Board of Parole Hearings' unsuitability factors are
9                   unconstitutional.

10         After careful consideration of the record and applicable law, it is recommended that

11  this petition for writ of habeas corpus relief be denied.

12                          **III. FACTUAL BACKGROUND**

13         The basic facts of Petitioner's July 7, 1980 crime were summarized in the probation

14  officer's April 1981 pre-sentencing investigation report as follows:

15         [A]t approximately 4:00 P.M. the victim, Debra Dobson, was waiting
           for a bus near the corner of 97th street and Graham Avenue in the City
16         of Los Angeles.  She was approached by the defendant and they
           began talking.  They then walked to Jordan Downs Project and the
17         victim purchased some "Shermans."   This refers to PCP laced
           Sherman cigarettes.  The defendant and the victim were then driven
18         by two men back to 97th Street and Graham Avenue where the
           defendant and the victim exited the vehicle.  The defendant and the
19         two men in the car had smoked the phencyclidine laced cigarette.
           After the car left the defendant and the victim were standing on a
20         corner when the defendant suddenly grabbed the victim's right arm
           and told her he needed a woman to go with him to buy an ounce of
21         "juice" and pawn a watch.  She refused and he released her arm.  He
           then began walking back and forth and again grabbed her arm and
22         pointed to an abandoned apartment house which was on blocks
           having just been moved to the location.  The victim refused and the
23         defendant again released her arm.  He then told her to follow him and
           she followed him to an alley between Graham Avenue and Beach
24         Street.  The victim then walked back to the bus stop but realized she
           had missed her bus.  The defendant then returned to her location and
25         then again grabbed her arm and pulled her in the direction of the
           alley.  She then freed her arm and was able to freely follow the
26         defendant.  As they neared the apartment building which was up on

                                            2

blocks the defendant grabbed her without warning and placed a choke hold on her with his right arm.  As she attempted to scream, the defendant stated, "Shut your damn mouth[,] bitch."  He attempted to push her to the ground but she resisted.  He then put his weight upon her back and forced her onto the ground.  As the victim attempted to scream and struggle the defendant told her he would take his knife out and reach[ed] towards his pants pocket.  He then continued to pull her pants off.  The defendant then lifted the victim off the ground and picked up a brick.  He told her that he would hit her with the brick if she continued to holler.  They walked down the alley with the defendant holding the victim by the back of her neck.  He placed the brick along the left side of her face.  They then entered the apartment building which was abandoned and up on blocks and the defendant then raped the victim while holding the brick and threatening to hit her with it.  The defendant then raped her a second time.  The victim then began to put on her clothes and the defendant told her he was going to rape her again.  She began crying and the defendant started combing her hair.  He then threw the brick away and led her back through the openings and out of the building.  They then parted company and the victim received a ride home from a passer-by.  She explained to this passer-by she had been raped and when she arrived home she told her mother what had happened.  Police Officers were called and a report was taken.  On July 10, 1980, at approximately 6:30 P.M. the victim flagged down a patrol car and indicated she had just seen the man who had raped her a few days earlier.  The officers entered Jordan Downs Housing Projects where the victim identified the defendant and he was arrested.

. . .

DEFENDANT'S STATEMENT

The defendant has failed to supply this officer with a written statement of the facts surrounding his arrest.  His right to submit a written statement was explained to him.  Verbally he indicates he had been to court earlier in the morning and went to the liquor store on his way home when he saw the victim.  He started talking to her and asked her if she could buy some Sherman cigarettes for him and she agreed.  They went to a house where they thought they could buy some "Sherms" but there was no one there.  They met some men on the street and got in the car with them and drove to Jordan Downs.  The victim then bought four one-half Sherman cigarettes and they all went to her front yard and smoked some Shermans.  The two men they had met then took them to the bus stop where the victim and the defendant got out of the car.  The victim said she was broke and that she needed some money for the bus and her child.  She suggested they go to a motel where the defendant could pay her for sex.  The defendant explained he had no money for a motel and suggested they go into the abandoned house.  They went into the abandoned house and had intercourse.  The defendant denies ever using force or threats of force in order to complete the act of intercourse.  Two days

3

later he was arrested and accused of raping the victim.

(Pet. Ex. A at 6-9.)   The District Attorney charged Petitioner with kidnapping with penalty enhancements for use of a deadly weapon and for a prior felony conviction.   In addition, Petitioner was charged with two counts of rape with penalty enhancements for use of a deadly weapon and prior felony conviction.     On March 17, 1981, Petitioner entered a guilty plea to the rape charge with a penalty enhancement for use of a firearm, and in exchange, Petitioner was promised no more than seven years incarceration.   All other charges were continued to the probation and sentencing hearing.   While defendant was out on bail awaiting sentencing on the rape charge, he committed another offense, described in the probation officer's August 1982 pre-sentencing investigation report as follows:

> On March 31, 1981, witnesses who were neighbors of the deceased victim, Rebecca Booker, established that the victim had been alive about 9:00 P.M. on that date.   While inside the house, a witness observed two television sets, one located in the living room, and the other, a portable type, located in the bedroom.   Witness, upon leaving the decedent's house, observed her to be in good health, having no bruises or marks on her body.   The following day, April 1, 1981, witness had gone to the victim's home at 11:30 in the morning to advise her she would pay her some money she owed her.   Witness knocked on the door and witness's children had told her earlier that the victim was home, having not seen her leave.   Witness knocked on the door and called her name; however, there was no answer.   Witness then looked through the mail slot, and observed something which appeared to be blankets lying on the floor.

> At the time the deceased was killed, Calvin Wallace had been living with the decedent approximately one year at 9724 Evers Street.   Mr. Wallace had keys that fit the house, including one key which fit the back door.   A steel door covers the wooden door entering the rear of the home, to which Mr. Wallace had one key for the steel door only. All of the windows of the home were covered with steel bars.

> On March 26, 1981, in the evening hours, witness Calvin Wallace was stopped for drunk driving, and after his arrest, the witness gave defendant his keys to take his car home to the victim decedent, Rebecca Booker.   The keys which he gave the defendant also contained the key to the security door of the house.   Witness Wallace was in custody for 90 days subsequent to his arrest for drunk driving, with the exception of a period of seven days when he was out of custody to attend the funeral of his girlfriend.   In view of Mr. Wallace's live-in relationship with the decedent, he was able to attest

4

to the fact that three televisions were located in the victim's home, including a floor model television in the living room, a portable model in the bedroom, which had a broken antenna, and a third model located in the kitchen.  In addition, the victim owned a Polaroid camera, as well as a small pocket camera.  The witness, Wallace, owned a ten-speed, maroon sturdy bicycle.  Upon witness Wallace's return to his and the decedent's home, he discovered property missing, which included a .38 snub-nosed revolver, two of the televisions, the two cameras and binoculars.  Additionally, witness Wallace's own personal bicycle was missing.

On April 1, 1981, Los Angeles police officers were called to the location of 9724 Evers Street, Los Angeles, at 2:00 P.M., regarding a possible death.  Upon officers' arrival, and inspection of the location, they observed no forced entry to the building, and all of the doors and windows were intact, which had been secured by iron bars.  The front door was unlocked, including both the wooden and security door.  The victim was observed in a prone position, face down on the living room floor and there appeared to be no sign of life.  There were lacerations to the left throat area of the victim's neck, and it appeared to be a deep wound.  Blood at the scene was located directly beneath the cut on the throat of the victim.  The victim appeared to be wearing a light pink robe with red trim, and draped across her right leg was a black jacket with the identification "Cal State, LA" on the left breast of the jacket.  Next to the victim's right leg was also a pink pajama bottom which was not on the body.  Officer was able to observe bloodstains around the body, and the victim's hair was messed and there were three hair rollers in the front part of the victim's hair.

Upon walking through the location, officer observed one television in the front room which was of a console-type.

On April 1, 1981, sometime between ten and 12 in the morning, witness Leon Hughes, Jr, who had previously been acquainted with the defendant, observed the defendant on a ten-speed bicycle which appeared to be brown in color.  The defendant was carrying a pair of binoculars and a camera, the camera appeared to be a Polaroid.  The defendant approached witness Hughes and asked if he was interested in the bike or the camera or the binoculars, as they were for sale.  The witness stated he was not, and then defendant left on the bicycle, taking the property with him.  Witness saw him again later in the day, at approximately 3:00 P.M., across the street, and at this time the defendant was in the back of a pickup truck, and he had a television set in his arms, and started to walk toward witness Hughes.  Defendant then offered to sell the television set to the witness for $20, and witness bought it.  Witness kept the television set for a couple of weeks, after which time the police came and took it.  The television set had a broken antenna.

On March 31, 1981, witness Pamela Rene Pitts was at the home of her grandmother on Bandera Street.  Witness Pitts, who had known

the defendant for approximately two years, and during which time witness Pitts and the defendant were previously involved in a romantic relationship. Witness Pitts' sister is Wanda Taylor, who at the time of the present offense was married to the defendant. On March 31, 1981, when the defendant was at witness Pitts' grandmother's home, he was wearing jeans and a tee-shirt, and was wearing a black jacket with the words "Cal State, LA" on it. He stayed for a short period of time, and then left the location, returning about 10:30 or 11:00 P.M., and was wearing overalls, but did not have on the jacket. When he returned to the house, he was carrying a camera and some binoculars, the camera appearing to be a Polaroid-type camera. Witness Pitts went to bed about 12:30 P.M., and when she did so, the defendant was still in the house. Upon awakening the following morning, about 6:30 A.M, the defendant was gone. She later saw him, about 11:00 A.M. on April 1, 1981, and upon arriving at the grandmother's residence, was wearing a shirt and some jeans, and witness was able to observe some bloodstains on the sleeve of the shirt he was wearing. The bloodstains appeared to be dry. When witness asked him about the bloodstains, the defendant rolled his sleeve up. The defendant left the grandmother's house about 11:30 A.M., and then witness saw him later on in the day, about 2:00 P.M., and when he arrived at the grandmother's residence, he did so on a ten-speed bicycle which witness knew belonged to Calvin Wallace.

DEFENDANT'S STATEMENT:

To date of dictation, defendant has not provided a written account.

Defendant was interviewed in local custody, where he orally related, "Just the jury says it was my sweater near the body . . . I just got a raw deal."

"I had nothing to do with it, but I did have the camera, the binoculars . . . I got them from another guy who asked if I could sell the stuff. I sold them at the liquor store for $50. I borrowed the bicycle from the same friend . . . they say the bike I was riding and all this stuff came from the deceased's house. I don't know the deceased."

"I did have the sweater, I didn't kill no damn body."

(Pet. Ex. C at 6-11.) On May 21, 1981, Petitioner was sentenced to a determinate term of seven

years in prison on the rape charge and related penalty enhancements. On August 4, 1982, following

a jury trial on the second set of charges, Petitioner was convicted of first degree murder with penalty

enhancements for use of a deadly weapon and a prior violent felony conviction. Petitioner was

sentenced on September 28, 1982 to an indeterminate term of twenty-nine years to life in prison with

the possibility of parole. This sentence was to be served consecutively to the seven year sentence

6

1   that Petitioner was already serving due to the aggravated nature of the crime, his extensive adult and

2   juvenile criminal record, history of violent conduct, and the fact that the murder was committed

3   while Petitioner was pending sentencing on the rape charges.  Petitioner was received by the

4   California Department of Corrections on October 4, 1982.   His life term began on June 27, 1986,

5   and his minimum eligible parole date passed on January 22, 2003.  Petitioner was denied parole for

6   a period of four years at his initial parole suitability hearing on February 28, 2002.  Petitioner

7   appeared before the Board for his first subsequent parole suitability hearing on February 14, 2007.

8   After considering numerous positive and negative suitability factors, the panel concluded that

9   Petitioner remained an unreasonable risk of danger to society, and thus he was not suitable for

10   parole.  Petitioner sought habeas corpus relief in the Los Angeles County Superior Court.  On

11   February 5, 2008, the court denied his petition, finding that the Board's determination that Petitioner

12   was unsuitable for parole was supported by some evidence in the record.  The California Court of

13   Appeal, Second Appellate District and the California Supreme Court both denied habeas corpus

14   relief without comment.  Petitioner filed this federal petitioner for writ of habeas corpus on June 20,

15   2008.  Respondent filed an answer on May 19, 2009, and Petitioner filed his traverse on June 2,

16   2009.

17                 **IV.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW**

18          This case is governed by the provisions of the Antiterrorism and Effective Death

19   Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of *habeas corpus* filed after

20   its enactment on April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114

21   F.3d 1484, 1499 (9th Cir. 1997).  Under AEDPA, an application for a writ of habeas corpus by a

22   person in custody under a judgment of a state court may be granted only for violations of the

23   Constitution or laws of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362,

24   375 n. 7 (2000).  Federal *habeas corpus* relief is not available for any claim decided on the merits

25   in state court proceedings unless the state court's adjudication of the claim:

26          (1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). *See also Penry v. Johnson*, 531 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001). This court looks to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).

## V. DISCUSSION

### A.    Due Process:  Sufficiency of the Evidence

Petitioner claims that the Board's determination that he was unsuitable for parole at the time of his 2007 parole suitability hearing was not supported by any relevant, reliable evidence in the record that he posed a current and unreasonable risk of danger to society. Petitioner contends that the facts and circumstances of his commitment offense do not support the Board's conclusion that he posed and unreasonable risk of danger to society. Moreover, rather than relying solely on the commitment offense, Petitioner argues that the Board improperly relied Petitioner's unrelated rape conviction in deeming him unsuitable for parole. Petitioner also contends that the Board improperly discounted his 2006 favorable psychological evaluation as "ridiculous" because the evaluator accepted as true Petitioner's claims of innocence regarding both the commitment offense as well as his prior convictions. In addition, Petitioner claims that the Board failed to consider its own power to find Petitioner suitable for parole while placing special conditions, such as abstinence from alcohol use, on his release. Lastly, Petitioner alleges the Board ignored that he had both marketable employment skills and realistic parole plans. Thus, according to Petitioner, the evidence in the record supports a finding of parole suitability, and the Board's arbitrary decision violated his

1  right to due process of law.

2  　　　　The Due Process Clause of the Fourteenth Amendment to the United States

3  Constitution prohibits state action that "deprive[s] a person of life, liberty or property without due

4  process of law." U.S. CONST. AMEND. XIV, § 2.  A person alleging a due process violation must first

5  demonstrate that he or she was deprived of a protected liberty or property interest, and then show

6  that the procedures attendant upon the deprivation were not constitutionally sufficient.  *Ky. Dep't.*

7  *Of Corrs. v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th

8  Cir. 2002).  A protected liberty interest may arise from either the Due Process Clause itself or from

9  state laws.  *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987).   In the context of parole, the United

10 States Constitution does not, in and of itself, create a protected liberty interest in the receipt of a

11 parole date, even one that has already been set.  *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  If

12 a state's statutory parole scheme uses mandatory language, however, it "'creates a presumption that

13 parole release will be granted' when or unless certain designated findings are made, thereby giving

14 rise to a constitutional liberty interest."  *McQuillan*, 306 F.3d at 901 (quoting *Greenholtz v. Inmates*

15 *of Neb. Penal*, 442 U.S. 1, 12 (1979)).

16 　　　　California state prisoners serving indeterminate prison sentences "may serve up to

17 life in prison, but they become eligible for parole consideration after serving minimum years of

18 confinement."  *In re Dannenberg*, 34 Cal.4th 1061, 1078 (2005).  California's statutory scheme

19 governing parole eligibility for indeterminately sentenced prisoners provides, generally, that a

20 release date will be granted unless the Board determines that "the gravity of the current convicted

21 offense or offenses, or the timing and gravity of current or past convicted offense or offense, is such

22 that consideration of the public safety requires a more lengthy period of incarceration." CAL. PENAL

23 CODE § 3041(b).  California state prisoners whose sentences carry the possibility of parole,

24 therefore, have a clearly established, constitutionally protected liberty interest in the receipt of a

25 parole release date.  *Allen*, 482 U.S. at 377-78 (quoting *Greenholtz v Inmates of Neb. Penal*, 442

26 U.S. 1, 12 (1979)).  *See also Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing *Sass v. Cal.*

1  *Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th

2  Cir. 2003); *McQuillion*, 306 F.3d at 903.

3          Despite the existence of this liberty interest, it is well established that inmates are not

4  guaranteed the "full panoply of rights" during a parole suitability hearing as are normally afforded

5  to criminal defendants under the Due Process Clause. *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396,

6  1398-99 (9th Cir. 1987).  Nonetheless, inmates are afforded limited procedural protections.  The

7  Supreme Court has held that a parole board, at minimum, must give an inmate an opportunity to be

8  heard and a decision informing him of the reasons he did not qualify for parole. *Hayward v.*

9  *Marshall*, 603 F.3d 546, 560 (9th Cir. 2010) (citing *Greenholtz*, 442 U.S. at 16).  In addition, as a

10  matter of state constitutional law, denial of parole to California inmates must be supported by "some

11  evidence" demonstrating that the inmate poses an unreasonable risk of danger to society. *Hayward*

12  *v. Marshall*, 603 F.3d 546, at 562 (citing *In re Rosenkrantz*, 29 Cal.4th 616 (2002)). *See also In re*

13  *Lawrence*, 44 Cal.4th at 1191 (recognizing the denial of parole must be supported by "some

14  evidence" that an inmate "poses a current risk to public safety"); *In re Shaputis*, 44 Cal.4th 1241,

15  1254 (2008) (same).  "California's 'some evidence' requirement is a component of the liberty

16  interest created by the parole system of [the] state," *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir.

17  2010), making compliance with this evidentiary standard mandated by the federal Due Process

18  Clause. *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010).

19          It is thus clear that Petitioner was entitled to an opportunity to be heard during his

20  parole hearing, a decision supported by "some evidence" that he remained a current risk to public

21  safety, and to be informed of the reasons he did not qualify for parole.  In this case, Petitioner does

22  not contend that he was not afforded an opportunity to be heard during his parole hearing.  Indeed,

23  the record reflects that the Board conducted Petitioner's hearing interactively, and Petitioner was

24  given opportunities not only to answer questions posed to him by the Board, the District Attorney,

25  and his own attorney, but also to personally address the Board prior to its deliberation.  Nor does

26  Petitioner contend that the Board failed to inform him of the reasons upon which it based its

1  determination that he did not qualify for parole.  In fact, Petitioner's due process claim focuses on

2  the sufficiency of the evidence cited by the Board support of its determination that he was unsuitable

3  for parole because he posed a current risk to public safety.

4       The analysis of whether a California parole board's suitability decision was supported

5  by "[some evidence] is framed by the [state's] statutes and regulations governing parole suitability

6  determinations . . . ."  *Irons*, 505 F.3d at 851.  A federal court undertaking review of a "California

7  judicial decision approving . . . [the Board's] decision rejecting parole" must determine whether the

8  state court's decision "was an 'unreasonable application' of the California 'some evidence'

9  requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'"

10 *Hayward*, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).  Accordingly, this court must "look

11 to California law to determine the findings that are necessary to deem a prisoner unsuitable for

12 parole, and then must review the record to determine whether the state court decision holding that

13 these findings were supported by 'some evidence' [] constituted an unreasonable application of the

14 'some evidence' principle." *Irons*, 505 F.3d at 851.

15      Title 15, Section 2402 of the California Code of Regulations sets forth various factors

16 to be considered by the Board in making its parole suitability findings for prisoners convicted of

17 murder.  The regulation is designed to guide the Board's determination of whether the inmate would

18 pose an "unreasonable risk of danger to society if released from prison," and, thus, whether he or

19 she is suitable for parole.  *In re Lawrence*, 44 Cal.4th at 1202.  The Board is directed to consider all

20 relevant and reliable information available, including

21          the circumstances of the prisoner's: social history; past and present
           mental state; past criminal history, including involvement in other
22          criminal misconduct which is reliably documented; the base and other
           commitment offenses, including behavior before, during and after the
23          crime; past and present attitude toward the crime; any conditions of
           treatment or control, including the use of special conditions under
24          which the prisoner may safely be released to the community; and any
           other information which bears on the prisoner's suitability for release.
25          Circumstances which taken alone may not firmly establish
           unsuitability for parole may contribute to a pattern which results in
26          a finding of unsuitability.

15 CAL. CODE REGS. § 2402(b).  In addition, the regulation sets forth nine specific circumstances tending to demonstrate suitability for parole and six specific circumstances tending to demonstrate unsuitability for parole:

(c) Circumstances Tending to Show Unsuitability.  The following circumstances each tend to indicate unsuitability for release.  These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel.  Circumstances tending to indicate unsuitability include:

(1) Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner...

(2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable social history.  The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems relating to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending to Show Suitability.  The following circumstances each tend to show that the prisoner is suitable for release.  The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel.  Circumstances tending to indicate suitability include:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting

to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for the Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

15 CAL. CODE REGS. § 2402(c) & (d).

The overriding concern is public safety, *In re Dannenberg*, 34 Cal.4th at 1086, and the focus of the inquiry is on the inmate's current dangerousness.  *In re Lawrence*, 44 Cal.4th at 1205.  Accordingly, under California law, the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that an inmate's release would unreasonably endanger public safety.  *In re Shaputis*, 44 Cal.4th at 1254.  Therefore, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public."  *In re Lawrence*, 44 Cal4th at 1212.  In other words, there must be a rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.  *Id*. at 1227.

In this case, the record reflects that the Board considered Petitioner's criminal, social

13

1    and family history, his attitude towards the commitment offense, his institutional disciplinary record,

2    his personal progress since becoming incarcerated, his history of drug and alcohol use and treatment,

3    his psychological evaluations, his post-incarceration plans for employment and residence, and letters

4    of support from family members.  Although the Board recognized that Petitioner's record reflected

5    some positive growth, the Board determined that Petitioner remained an unreasonable risk of danger

6    to society and denied him parole.

7              Petitioner was born on October 29, 1951 in Little Rock, Arkansas, and moved to Los

8    Angeles in 1960, where he was raised.  Petitioner's parents are separated.  His mother receives

9    disability benefits due to a nervous breakdown.  His father is also disabled, but it is unclear from the

10   record whether he also receives benefits.  Since Petitioner was transferred to CSP Solano, his mother

11   has visited him one time.  At the time of his parole hearing, Petitioner's mother was his only visitor

12   in the ten years he had been incarcerated there.  Petitioner keeps in touch with his two younger

13   sisters, who both live in the Los Angeles area, through letters and phone calls.  One of his sisters

14   would like to visit, but is not able because she is "on probation for something she has no knowledge

15   of."  (Pet. Ex. F at 25.)

16             Petitioner dropped out of school in the tenth grade and began "hustling" on the

17   streets.  (Pet. Ex. F at 19.)  According to Petitioner, he was "making the big money" by selling

18   marijuana, reds, and pipes.  (Pet. Ex. F at 18.)  Eventually Petitioner stopped selling drugs because

19   he grew tired of the risk.  He was employed in a steel mill from 1968 until 1970 when he was

20   convicted of forcible rape and sentenced to fifteen years to life in prison with the possibility of

21   parole.  Petitioner served eight years on the rape conviction and was paroled in 1978.  He was

22   discharged from parole in 1980.  Petitioner earned his GED while incarcerated in 1975.

23             Following his 1978 release from prison, Petitioner was employed in a number of odd

24   jobs for various companies, including the Hollywood Racetrack, Global Die Casting Company,

25   Burning Fork Laurel Plant, Rangers Die Casting, Mobile Oil, Leisure Craft, and Olympic Fasteners.

26   Petitioner married Wanda Taylor in May of 1981.  The marriage ended in 1989, but the couple have

1  a son who was twenty-five at the time of Petitioner's hearing.  Petitioner's contact with his son is

2  infrequent, "maybe once a year, twice a year."  (Pet. Ex. F at 21.)

3          Petitioner claimed that his pre-incarceration drug and alcohol use was limited to

4  drinking alcohol and using marijuana or pills on the weekends.  Petitioner also claimed he used

5  phencyclidine ("PCP") once, but had a bad experience and never tried it again.  Petitioner denied

6  ever having a drug problem.  The deputy commissioner noted, however, that the report prepared by

7  the probation officer for Petitioner's 1981 rape sentencing opined that Petitioner was "a life-long

8  criminal with a proclivity toward sexual offenses and use of dangerous drugs."  (Pet. Ex. A at 10.)

9  A review of the report itself indicates that, prior to his arrest and conviction for the rape, Petitioner

10  drank alcohol daily, smoked marijuana approximately twice a week, and had been taking "whites"

11  up to three times a month since the age of fourteen.  The report also reflects that between ages

12  thirteen and fifteen, Petitioner took between six and ten "reds"per day, and continued to use them

13  on an occasional basis until age eighteen.  Petitioner overdosed on "reds" in 1969 but was saved by

14  friends.  Petitioner used PCP twice a month between the ages of twenty-six and twenty-eight, but

15  at the time of the report, had not used for approximately six months.  The record also reflects that

16  Petitioner consumed alcohol prior to the commitment offense, and that he was on PCP at the time

17  of his 1980 rape offense.  Petitioner's criminal history reflects several arrests or convictions for

18  possession of a controlled substance or being under the influence of a controlled substance.  In

19  addition, Petitioner's institutional disciplinary record reflects that he has received several CDC Form

20  115 Rules Violation Reports for possession of marijuana and manufacturing alcohol.[2]  With regard

21  to the 115 incurred for possession of marijuana, Petitioner explained he tested positive for marijuana

22  because he was present while other inmates were smoking and he inhaled the smoke second hand.

23          Petitioner's criminal history is extensive.  He informed the psychologist conducting

24

25          [2] CDC Form 115, a "Rules Violation Report," documents conduct that is believed to be a violation of the law or that is not minor in nature. 15 CAL. CODE REGS. § 3312(a)(3).  By contrast,
26  CDC Form 128-A, a "Custodial Counseling Chrono," documents incidents of minor inmate misconduct and the counseling provided. 15 CAL. CODE REGS. § 3312(a)(2).

his 2006 evaluation that he incurred approximately seven to ten arrests as a juvenile as well as fifteen to twenty arrests as an adult. The 1981 and 1982 pre-sentence investigation reports reveal the details of some of these arrests. In 1969, as a juvenile, Petitioner was charged with assault likely to produce great bodily injury. As a result, he was declared a ward of the court and placed on probation. Subsequent to this incident, Petitioner was arrested on three separate occasions for burglary and on one occasion for being under the influence of drugs. In 1970, as an adult, Petitioner was arrested for burglary, but pled guilty to trespass and received three years probation and a fine. In 1971, Petitioner was arrested for forcible rape on two separate occasions, as well as robbery in connection with the second rape. The District Attorney rejected the charges with regard to the first incident, but Petitioner pled guilty to both the rape and robbery with regard to the second incident, serving seven years in prison before being released on parole in 1978. Following his release from prison, Petitioner was arrested in 1979 for felony burglary, but the outcome of this arrest is unclear. In 1980, Petitioner was arrested twice for possession of PCP. He pled guilty as to the first arrest, and received 180 days in jail, with credit for eight days already served. The outcome of the second arrest is unclear. Later on 1980, Petitioner was again arrested for possession of PCP, as well as possession of PCP for sales, and disorderly conduct. Petitioner pled guilty solely to the possession charge, and received two years probation and six months in jail, with credit for 129 days already served. Also in 1980, Petitioner was again arrested for forcible rape, as well as felony kidnaping and use of a deadly weapon in connection with the rape. Petitioner pled guilty to the rape charge and was out on bail pending sentencing in this case when he committed murder and was again arrested. The Board expressed concern that, in spite of Petitioner's guilty plea to the 1980 rape, when questioned during the hearing he referred to it as an "alleged rape."

Since entering prison, Petitioner has availed himself of available, relevant self-help programming within the institution in a very limited manner. Petitioner obtained his GED in 1975, however the Board noted no upgrades in education or academics in the time period stretching from October 2001 through October 2006, although he did remain discipline free during this time. During

1  the same time frame, Petitioner also failed to upgrade vocationally, did not participate in any sort
2  of psychiatric treatment and, absent a period extending from June 2004 through June 2005, did not
3  participate in any group activities.  When asked how he spends his time, Petitioner stated that he
4  rests, studies the judicial system, fights his case, and exercises in the yard.  Petitioner does not spend
5  time studying human behavior or anything that would assist him psychologically.

6          Petitioner participated in Alcoholics Anonymous ("AA") from 1989 until 1992 and
7  Narcotics Anonymous ("NA") from 1992 until 1995.  In 1996, Petitioner participated in a twelve-
8  step Islamic substance abuse program.  At the time of his 2007 parole hearing, however, it had been
9  over ten years since Petitioner participated in any sort of substance abuse programming.  When the
10 deputy commissioner expressed concern regarding Petitioner's apparently extensive history of
11 substance use, as described above, and his failure to continuously and consistently participate in
12 substance abuse programming, Petitioner denied that his substance use history was as extensive as
13 the record reflects, and stated that he quit participating in substance abuse programming because he
14 considered himself a "cured guy."  (Pet. Ex. F at 38.)  Petitioner informed the Board that he didn't
15 feel that he needed to "sell himself" in order to obtain a parole date.  (Pet. Ex. F at 38.)  Despite
16 having previously accepted responsibility for the 1980 rape offense, Petitioner denied being on PCP
17 during the commission of the rape, instead stating that it was actually the victim who was on PCP
18 at the time of the offense.

19          While recognizing that Petitioner's participation in self help programming has been
20 minimal, the Board noted that Petitioner has gained employment experience as a linebacker in the
21 dining hall, as a porter to visiting level II, in the infirmary cleaning crew and in Prison Industry
22 Authority ("PIA") Laundry, where he earned a proficiency certificate in machinery operation in
23 2006. Petitioner received a vocational certificate in upholstery in 1995. In 2005, Petitioner received
24 certificates and laudatory chronos for participating in a five week stress management class and a
25 twelve week anger management program.  He also received laudatory chronos from his work
26 supervisor at PIA Laundry and for his participation in a tobacco cessation program and a

relationship awareness workshop.  In 2006, Petitioner earned laudatory chronos for a promotion, for exemplary performance, for continuing to work and keeping clothing clean during a tuberculosis outbreak, and for reduction in water usage at PIA Laundry.  In the same year, Petitioner earned a certificate of proficiency as a laundry machine tender flatwork operator.  At the time of the hearing, he had taken a test to become a certified linen technician, but had not yet received the certificate.  Petitioner also informed the Board that he could drive a truck or forklift and could work in a foundry.  The Board noted that it seemed as though Petitioner "kind of lit a fire under [himself] to get this self help going within the last few years."  (Pet. Ex. F at 38.)  Petitioner informed the Board that he was doing it because the Board wanted him to, not because he felt that he needed to participate in self help programming.

While incarcerated, Petitioner has received twenty-one serious 115 disciplinary violations beginning in 1981, and most recently in 2000 for refusing a urine analysis.  Petitioner's other serious disciplinary infractions include:

> contraband and a radio, failure to report to work, smuggling sugar, stimulants and sedatives, unauthorized radio, refusing a direct order, aggressive behavior, contraband, a hot pot, refusing to sign job descriptions, refusal to sign job description a second time, a high volume level [T.V.], disrespecting staff, rights in respect to others, failure to report to work, refusing to show skin for count, leaving assignment without permission, inciting others, disrespect towards staff, evading a job assignment, possession of controlled substance and refusing to pee in a bottle [for urine analysis]."

(Pet. Ex. G at 36-37)  In addition, Petitioner has received eleven less serious 128 disciplinary violations, the most recent incurred in 2000 for refusing to report to a job assignment.

Petitioner's initial parole plans involved moving in with his mother, but he decided that plan was unrealistic because her apartment was too small.  Instead, he hoped to reside with his sister.  He claimed to have spoken with her regarding this plan and stated that she had intended to mail a letter to the Board in support of this plan.  Petitioner was not sure why the Board had not yet received the letter.  Petitioner's sister lived in Watts at the time and Petitioner believed she worked in the janitorial department of a school.  However, this was the same sister that Petitioner previously

18

mentioned might be on parole or probation, which the Board noted would preclude Petitioner from residing with her if released on parole. Petitioner also mentioned the possibility of residing in a halfway house, but did not specify a particular one. In addition, Petitioner claimed PIA Laundry had offered him residence and employment for a year in either Los Angeles or San Diego. The Board was familiar with the program but did not believe it provided residential housing. If Petitioner could gain any sort of employment he wished, with no constraints, he stated he would like to work for a city in the area of flood control. Petitioner had not, however, done anything to increase his education in that area.

Petitioner's most recent psychological report appeared to be favorable, concluding that:

> Mr. Hines stated that he did not commit the instant offense. If this is the case, then he does not have a significant violence history, and he has not been violent since his incarceration. He has a place to live and a job offer. He has some support from his family. He has maintained his abstinence from illegal substances and does not appear to have any desire to use any.
>
> Given his recorded history in the files reviewed and from interview and psychological evaluation of the inmate on December 13, 2006, he appears to show a low risk of dangerousness and violence when compared to other life-term inmates. This would be the case, at least, if he is accurate and that he is innocent of the instant offense, but nonetheless, he has not shown himself to be a dangerous or violent person within the CDCR.

(Pet. Ex. H at 6.) In contrast, however, Petitioner's 2002 psychological report was unfavorable. That doctor opined that, if he were released, there was a high risk that Petitioner would again commit a violent offense. The doctor also believed that Petitioner's "insight into and appreciation of the nature of his substance use problem [was] minimized and superficial and his perceived ability to maintain this sobriety appear[ed] over-inflated." (Pet. Ex. F at 50.) Accordingly, Petitioner's risk "for violent or harmful behavior is exacerbated by the use or abuse of drugs or alcohol and an association with his antisocial, maladaptive behavioral characteristics." (Pet. Ex. F at 52.) Moreover, the doctor expressed concern regarding Petitioner's involvement in offenses of a forced

sexual nature, "especially since there has been no personal acknowledgment [by Petitioner] of contributing cognitive factors that often underlie such behaviors" and Petitioner did "not see himself as having a sexually oriented problem." (Pet. Ex. F at 52-53.) Therefore, the doctor concluded that Petitioner had failed to accept responsibility for his actions, was not seeking to rehabilitate himself, and was instead "channel[ing] his energy into appeal[ing] his case while maintaining his physical and intellectual health." (Pet. Ex. F at 53-54.)

The captain of the Los Angeles Police Department opposed Petitioner's release. The District Attorney also opposed Petitioner's release, on multiple grounds. The DA noted that Petitioner's adult criminal history involved both drugs and violence, dating back to 1970. The DA emphasized that Petitioner was previously incarcerated for a rape committed in 1970, and within two years of his release on parole, had committed another rape, as well as a murder. The DA expressed concern that the commitment offense occurred while Petitioner was awaiting sentencing on his second rape conviction. The DA next noted that Petitioner demonstrated an escalating pattern of criminal conduct beginning at an early age, a history of assaultive behavior, a pattern of tumultuous relationships, a theme of drug use inside and outside of prison, no realistic parole plans, inconsistent and insufficient substance abuse programming, limited self help programming only because he thought the Board wanted him to, and no real desire to rehabilitate himself. The DA also found the 2006 psychological report "laughable" because the psychologist concluded Petitioner was without a violent background based on his denial of the commitment offense, essentially ignoring that Petitioner has been convicted on two separate occasions of forcible rape, in addition to other violent crimes.

After considering all of the above information, the Board concluded that Petitioner remained an unreasonable risk of danger to society and was therefore not yet suitable for parole. The Board considered Petitioner to be a very dangerous person, and thus issued a four year denial of parole, noting that if it were possible, the denial would have been for longer.

Without requiring Petitioner to confess to the commitment offense, a crime for which

20

Petitioner has maintained his innocence, the Board relied in part on the commitment offense to support its denial of parole. A prisoner's commitment offense can be a parole unsuitability factor if it was committed in an especially heinous, atrocious or cruel manner. 15 CAL. CODE REGS. § 2402(c)(1). Given the liberty interest that California prisoners possess in their release on parole, however, the Ninth Circuit has cautioned that continued reliance on an unchanging factor, such as a prisoner's commitment offense or pre-incarceration conduct, to support a finding of unsuitability may, over time, constitute a violation of due process where there is evidence of rehabilitation and the prisoner has served the minimum term of years on his sentence. *Irons*, 505 F.3d at 852-53. Thus, in order for the circumstances of a commitment offense to support the denial of parole, there must be "something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state," that indicates "the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination" of the prisoner's current or future dangerousness. *Cooke*, 606 F.3d at 1216 (quoting *In re Lawrence*, 44 Cal.4th at 1214). "[T]here must be more than the crime or its circumstances alone to justify the Board's . . . finding of current dangerousness." *Id*. at 1214 (citing *Lawrence*, 44 Cal.4th at 1214).

Under the applicable state regulations, factors relating to a commitment offense tend to show unsuitability for parole where the offense was committed in an "especially heinous, atrocious or cruel manner," such as (A) multiple victims were attacked, injured or killed; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution style murder; (C) the victim was abused, defiled or mutilated; (D) the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; or (E) the motive for the crime is inexplicable or very trivial in relation to the offense. 15 CAL. CODE REGS. § 2402(c)(1)(A)-(E). Here, without requiring Petitioner admit guilt or discuss the commitment offense, the Board determined that the offense fit the regulatory scheme for one that was committed "in an especially heinous, atrocious or cruel manner." 15 CAL. CODE REGS. § 2402(c)(1), finding four of the above

21

factors to be supported in the record.

Specifically, the Board found that multiple victims were attacked in two separate incidents. 15 CAL. CODE REGS. § 2402(c)(1)(A). The Board explained that there were two offenses, a rape and a murder, for which Petitioner was sentenced consecutively, and that there was a separate victim of each offense.[3]

The Board also found that the commitment offenses were carried out in dispassionate manner, 15 CAL. CODE REGS. § 2402(c)(1)(B), and in a manner which demonstrated an exceptionally callous disregard for human suffering, 15 CAL. CODE REGS. § 2402(c)(1)(D). The evidentiary record supports these findings. Petitioner was entrusted by the victim's boyfriend with the keys to his car in order take the car home to the victim. The key ring also contained the key to the victim's home. The murder victim was discovered face down on her living room floor with deep lacerations to her throat and neck area, and her pink pajama bottoms were not on her body but instead were found lying next to her right leg. Following the murder, witnesses saw Petitioner around the neighborhood attempting to sell items that appeared to have been stolen from the victim's home. The Board noted, with respect to the rape, that Petitioner grabbed the victim without warning, placed a choke hold on her, forced her to the ground, pulled her pants off, lifted her off the ground, grabbed her by the back of the neck, held a brick against her face, and led her to an abandoned apartment building where he raped the victim twice while threatening to hit her with the brick. Moreover, the murder was committed while Petitioner was pending sentencing on the rape.

The Board additionally cited Petitioner's motive for the murder, 15 CAL. CODE REGS. § 2402(c)(1)(E). In order to fit the regulatory description for an inexplicable or very trivial offense,

---

[3] Petitioner claims that the Board improperly relied upon both the murder and the rape offenses because he served a determinate sentence of seven years for the rape offense, which had long concluded prior to his parole suitability hearing. According to Petitioner, the Board was limited to considering solely the circumstances of the murder, as that was the crime that was keeping him in prison. Even assuming arguendo that Petitioner's contention is correct, it would make no difference here because, as discussed above, the evidentiary record supports the Board's determination that the murder was "especially heinous, atrocious or cruel" under section 2402.

a prisoner's motive must have been *more* trivial than those which conventionally drive people to commit the offense in question. *See In re Scott*, 119 Cal.App.4th 871, 893 (2004) (reasoning that all motives for murder could reasonably be deemed "trivial"). The rationale behind this factor is that one whose motive is unintelligible or cannot be explained may be unusually unpredictable and dangerous. *Id.* Here, there was evidence in the record that after committing the murder, Petitioner stole numerous items from the victim's home and attempted to sell them around the neighborhood. Financial gain is, indeed, a trivial reason to commit murder. The Board also pondered whether rape may have been an additional motivation in light of Petitioner's history of violence against women. The record also reflects, as noted above, that the victim was not wearing her pajama pants at the time she was discovered, but rather they lay on the ground next to her right leg. Under the circumstances of this case, where Petitioner's conduct was so heinous, a conclusion that he may be unusually unpredictable and dangerous due to a trivial or inexplicable motive is not unreasonable.

In order for these circumstances to support the denial of Petitioner's parole, there must be some indication that they remain probative to the statutory determination of his current or future dangerousness. *See Cooke*, 606 F.3d at 1216 (quoting *Lawrence*, 44 Cal.4th at 1214). The California Supreme Court has explained that "it is not the circumstance that the crime is particularly egregious that makes a prisoner unsuitable for parole, it is the implication concerning future dangerousness that derives from the prisoner having committed that crime." *Lawrence*, 44 Cal.4th at 1207. In other words, California law authorizes the Board to consider the circumstances of the commitment offense, but only insofar as those circumstances relate to the inmate's current dangerousness. *Id.* at 1214.

Here, the Board did not rely exclusively on the circumstances of the commitment offenses to conclude that Petitioner posed a current danger to society. In addition, the Board relied on Petitioner's: (1) extensive criminal history; (2) previous record of violent and assaultive behavior; (3) significant substance abuse history and failure to consistently and continuously participate in substance abuse programming; (4) condescending and flippant attitude during the suitability hearing;

23

1  (5) lack of any realistic parole plans; (6) institutional disciplinary record; and (7) insufficient

2  participation in self help programming, particularly in the area of violence against women.  All of

3  these factors are permissible considerations in determining parole suitability under title 15, section

4  2402 of the California Code of Regulations, and all of these factors are supported by relevant and

5  reliable evidence in the record.  The Board also noted that Petitioner's most recent psychological

6  evaluation could not be considered reliable because it failed to consider Petitioner's extensive

7  history of violence, his criminal record, or the risk of danger Petitioner posed to the community if

8  his claims of innocence regarding the murder were untrue.  The Board explained that although there

9  were some positive factors in Petitioner's case, such as his work experience, his recent completion

10  of a few self help programs, that he had obtained his GED, and his participation in some sort of

11  substance abuse programming from 1988 until 1996, it nonetheless concluded that these positive

12  factors did not outweigh the negative factors and thus determined that Petitioner was unsuitable for

13  parole.  To the extent Petitioner disagrees with the manner in which the Board weighed the evidence,

14  or contends that the Board assigned insufficient weight to the positive factors, no relief is available

15  because this court is precluded from re-weighing the evidence.

16          The Board's decision withstands the minimally stringent "some evidence" standard.

17  The circumstances of the commitment offense, combined with the other negative factors set forth

18  above, suffice to support the Board's 2007 decision.  It is also clear from the record that Petitioner

19  was given an opportunity to be heard during the parole hearing and was informed of the reasons for

20  the Board's decision, thus satisfying federal due process.  Because Petitioner has received all process

21  he was due, he is not entitled to federal habeas corpus relieve on his claim challenging the evidence

22  supporting the Board's parole unsuitability determination.

23  **B.     Unsuitability Factors**

24          Petitioner makes several claims regarding the constitutionality of the relevant sections

25  of the California Code of Regulations and the California Penal Code governing parole suitability

26  determinations.  Petitioner first claims that section 3041(b) of the California Penal Code limits the

24

factors permissibly considered by the Board in parole suitability determinations solely to the gravity of the commitment offense. Accordingly, unless the Board concludes "that the gravity of the current or past convicted offense or offenses [ ] is such that consideration of the public safety requires a more lengthy period of incarceration for this individual," a parole release date must be set. CAL. PENAL § 3041(b). Petitioner claims, therefore, that the Board improperly relied upon additional factors irrelevant to the gravity of his commitment offense, including, *inter alia,* his juvenile convictions, arrests which did not result in convictions, his mother's nervous breakdown, his limited relationship with his family, and various psychological factors in finding him unsuitable for parole. In considering factors outside of the commitment offense, Petitioner contends that the Board improperly enlarged the scope of information it is permitted by section 3041 to consider in making a parole suitability determination. This is essentially an argument that the Board violated the California Penal Code in deeming him unsuitable for parole, and is thus a matter of state law. Because federal habeas corpus relief may be granted only for a violation of the Constitution or laws of the United States, this claim is not addressed herein. 28 U.S.C. § 2254(a). *See also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (holding that federal habeas corpus relieve is not available to remedy alleged errors of state law).

Petitioner next claims that the suitability and unsuitability criteria set forth in the California Code of Regulations are void because they violate the separation of powers doctrine by encroaching on the power of the California legislature to determine parole eligibility for specific convicted offenses. *See* 15 CAL. CODE REGS. § 2402. It is unclear, however, whether Petitioner is claiming that the Board has violated the separation of powers doctrine under the federal or state constitution. Regardless, Petitioner's claim must fail. A claim that the Board violated the federal constitution is not cognizable because the federal doctrine of separation of powers does not extend to the states under the Fourteenth Amendment. *See Hughes v. Superior Court*, 339 U.S. 460, 467 (1950) ("[T]he Fourteenth Amendment leaves the States free to distribute the powers of government as they will between their legislative and judicial branches."). Thus, Petitioner cannot claim that

1  the federal separation of powers doctrine applies to the Board's actions as the Board is a state
2  agency.  A claim that the Board violated the separation of powers doctrine contained in the
3  California state constitution does not give rise to a claim for federal habeas corpus relief.  *See*
4  *Middleton v Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985).

5        Petitioner also claims that the Board's reliance on the gravity of an inmate's
6  commitment offense to revoke that inmate's parole eligibility is unconstitutional because it is based
7  on a capital murder special circumstance, that the crime was especially heinous, atrocious or cruel.
8  According to Petitioner, this circumstance must be proven to a jury beyond a reasonable doubt
9  because it increases the punishment for an inmate's commitment offense.  The rule referenced by
10 Petitioner stems from *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, which
11 established that "under the Sixth Amendment, any fact that exposes a defendant to a greater potential
12 sentence [than the statutory maximum] must be found by a jury, not a judge, and established beyond
13 a reasonable doubt, not merely a preponderance of the evidence." *Cunningham v. California*, 549
14 U.S. 270, 281 (2007). *See also Blakely v. Washington*, 542 U.S. 296 (2005).  The relevant statutory
15 maximum "'is not the maximum sentence a judge may impose after finding additional facts, but the
16 maximum he may impose *without* any additional findings." *Id*. at 275.  Here, Petitioner stands
17 convicted of first degree murder, and that conviction carries a statutory maximum sentence of life
18 imprisonment. CAL. PENAL CODE § 190.  Therefore, no additional facts must be found beyond those
19 which were found by the jury at Petitioner's trial, and the Board's determination that Petitioner was
20 not suitable for parole did not increase the punishment, which is up to life imprisonment, for
21 Petitioner's commitment offense.

22       In addition, Petitioner is mistaken with regard to the role the Board plays in parole
23 suitability determinations.  An inmate serving an indeterminate life sentence becomes eligible for
24 parole after serving a minimum period of confinement.  *In re Dannenberg*, 34 Cal.4th 1061, 1078
25 (2005).  Such inmates may serve up to life in prison, but may be released on parole if they are
26 deemed suitable by the Board after considering a variety of relevant and reliable factors bearing on

1  their current dangerousness. *See* 15 Cal. Code Regs §§ 2402 and 2281. The Board's unsuitability

2  determination does not, therefore, revoke an inmate's eligibility for parole. Under certain

3  circumstances, however, it is possible that indeterminately sentenced inmates eligible for parole may

4  nonetheless never be deemed suitable for parole if the Board determines that they remain an

5  unreasonable risk of danger to society.

6          Petitioner next claims that the Board construes every indeterminately sentenced

7  inmate's commitment offense as "especially heinous, atrocious, or cruel," and there is thus no

8  meaningful standard by which to narrow the class of person to whom this factor applies. This

9  appears to be a claim that title 15, section 2402 of the California Code of Regulations, which

10 governs parole suitability determinations for murderers is unconstitutionally vague.[4] Generally, a

11 regulation is void for vagueness "if it fails to give adequate notice to people of ordinary intelligence

12 concerning the conduct it proscribes or if it invites arbitrary and discriminatory enforcement."

13 *United States v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989). *See also Humanitarian Law Project*

14 *v. Mukasey*, 509 F.3d 1122, 1134 (9th Cir. 2007) ("To survive a vagueness challenge, the statute

15 must be sufficiently clear to put a person of ordinary intelligence on notice that his or her

16 contemplated conduct is unlawful."); *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998)

17 (A statue must be sufficiently clear so as to allow persons of ordinary intelligence a reasonable

18 opportunity to know what is prohibited.). "[A] party challenging the facial validity of [a law] on

19 vagueness grounds outside the domain of the First Amendment must demonstrate that the enactment

20 is impermissibly vague in all of its applications." *Hotel & Motel Ass'n of Oakland v. City of*

21 *Oakland*, 344 F.3d 959, 972 (9th Cir. 2003) (internal quotations omitted). Moreover, "[t]he Due

22 Process Clause does not require the same precision in the drafting of parole release statues as is

23 required in the drafting of penal laws." *Hess v. Bd. of Parole and Post-Prison Supervision*, 514 F.3d

24

25     [4] Title fifteen, section 2402 of the California Code of Regulations is identical to section 2281.
   *In re Shaputus*, 44 Cal.4th at 1257 n.13. The only difference is that section 2402 governs parole
26 suitability determinations for murderers and attempted murderers while section 2281 governs life
   prisoners convicted of crimes other than murder or attempted murder.

909, 914 (9th Cir. 2008) (citing *Glauner v. Miller*, 184 F.3d 1053, 1055 (9th Cir. 1999)).  The statute need only make a "principled distinction" between those who are suitable for parole and those who are not.  *Id.*

Petitioner's claim must fail because it ignores the five sub-factors set forth for the Board's consideration in determining whether an inmate's commitment offense was "especially heinous, atrocious, or cruel."  These factors are enumerated in section 2402(c)(1)(A)-(E), and include: (A) whether multiple victims were attacked, injured or killed in the same or separate incidents; (B) whether the offense was carried out in a dispassionate and calculated manner; (C) whether the victim was abused, defiled or mutilated during the offense; (D) whether the offense was carried out in a manner demonstrating an exceptionally callous disregard for human life; and (E) whether the motive for the crime was very trivial in relation to the offense.  15 Cal. Code Regs § 2402(c)(1)(A)-(E).  Because a finding that an inmate's commitment offense is "especially heinous, atrocious, or cruel" is further limited by these five detailed factors, it does not appear to be unconstitutionally vague.  *See Arave v. Creech*, 507 U.S. 463, 470-78 (1993) (Idaho death penalty statute which cited as an aggravating factor that the crimes were carried out in "utter disregard for human life" was not impermissibly vague because limiting construction had been adopted defining this factor as demonstrating "the utmost disregard for human life, i.e., the cold-blooded pitiless slayer").  Even if the challenged language were unconstitutionally vague, which it is not, the Board's reliance on multiple factors, other than factors related to the commitment offense, would still provide "some evidence" to support the Board's decision.  *See Sass*, 461 F.3d at 1128-29.  Accordingly, Petitioner's challenge to the constitutionality of section 2402 on vagueness grounds is without merit.

## VI. CONCLUSION

IT IS RECOMMENDED that Petitioner's petition for writ of *habeas corpus* be denied.  These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one days

28

after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In any objections he elects to file petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: December 17, 2010


*Charlene H. Sorrentino*
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE