IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LARRY HINES,

    Petitioner,                    No. CIV S-08-CV-1415 GEB CHS P

   vs.

D.K. SISTO[1],

    Respondent.               FINDINGS AND RECOMMENDATIONS

                             /

## I. INTRODUCTION

Petitioner, Larry Hines, is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is currently serving an indeterminate sentence of thirty-six years to life following his 1981 guilty plea to forcible rape with a penalty enhancement for use of a deadly weapon and his 1982 jury conviction for first degree murder with penalty enhancements for use of a deadly weapon and a prior violent felony conviction. Here, Petitioner does not challenge the constitutionality of his convictions, but rather, the execution of his sentence, and specifically, the February 14, 2007 decision by the Board of Parole Hearings (the

---

[1] Gary Swarthout is substituted for his predecessor, D.K. Sisto, as the current acting warden at California State Prison, Solano, where Petitioner is currently incarcerated, pursuant to Fed. R. Civ. P. 25(d).

1  "Board") finding him unsuitable for parole.

## II. ISSUES PRESENTED

Petitioner alleges two grounds for relief in his pending petition. Specifically, Petitioner's claims are as follows:

> (1) The Board of Parole Hearings' decision to delay setting Petitioner's parole release date was not supported by any relevant, reliable evidence in the record that he currently poses an unreasonable risk of danger to society and was arbitrary, in violation of Petitioner's right to due process of law under the Fifth and Fourteenth Amendments.
>
> (2) The Board of Parole Hearings' unsuitability factors are unconstitutional.

After careful consideration of the record and applicable law, it is recommended that this petition for writ of habeas corpus relief be denied.

## III. FACTUAL BACKGROUND

The basic facts of Petitioner's July 7, 1980 crime were summarized in the probation officer's April 1981 pre-sentencing investigation report as follows:

> [A]t approximately 4:00 P.M. the victim, Debra Dobson, was waiting for a bus near the corner of 97th street and Graham Avenue in the City of Los Angeles. She was approached by the defendant and they began talking. They then walked to Jordan Downs Project and the victim purchased some "Shermans." This refers to PCP laced Sherman cigarettes. The defendant and the victim were then driven by two men back to 97th Street and Graham Avenue where the defendant and the victim exited the vehicle. The defendant and the two men in the car had smoked the phencyclidine laced cigarette. After the car left the defendant and the victim were standing on a corner when the defendant suddenly grabbed the victim's right arm and told her he needed a woman to go with him to buy an ounce of "juice" and pawn a watch. She refused and he released her arm. He then began walking back and forth and again grabbed her arm and pointed to an abandoned apartment house which was on blocks having just been moved to the location. The victim refused and the defendant again released her arm. He then told her to follow him and she followed him to an alley between Graham Avenue and Beach Street. The victim then walked back to the bus stop but realized she had missed her bus. The defendant then returned to her location and then again grabbed her arm and pulled her in the direction of the alley. She then freed her arm and was able to freely follow the defendant. As they neared the apartment building which was up on

blocks the defendant grabbed her without warning and placed a choke hold on her with his right arm. As she attempted to scream, the defendant stated, "Shut your damn mouth[,] bitch." He attempted to push her to the ground but she resisted. He then put his weight upon her back and forced her onto the ground. As the victim attempted to scream and struggle the defendant told her he would take his knife out and reach[ed] towards his pants pocket. He then continued to pull her pants off. The defendant then lifted the victim off the ground and picked up a brick. He told her that he would hit her with the brick if she continued to holler. They walked down the alley with the defendant holding the victim by the back of her neck. He placed the brick along the left side of her face. They then entered the apartment building which was abandoned and up on blocks and the defendant then raped the victim while holding the brick and threatening to hit her with it. The defendant then raped her a second time. The victim then began to put on her clothes and the defendant told her he was going to rape her again. She began crying and the defendant started combing her hair. He then threw the brick away and led her back through the openings and out of the building. They then parted company and the victim received a ride home from a passer-by. She explained to this passer-by she had been raped and when she arrived home she told her mother what had happened. Police Officers were called and a report was taken. On July 10, 1980, at approximately 6:30 P.M. the victim flagged down a patrol car and indicated she had just seen the man who had raped her a few days earlier. The officers entered Jordan Downs Housing Projects where the victim identified the defendant and he was arrested.

. . .

DEFENDANT'S STATEMENT

The defendant has failed to supply this officer with a written statement of the facts surrounding his arrest. His right to submit a written statement was explained to him. Verbally he indicates he had been to court earlier in the morning and went to the liquor store on his way home when he saw the victim. He started talking to her and asked her if she could buy some Sherman cigarettes for him and she agreed. They went to a house where they thought they could buy some "Sherms" but there was no one there. They met some men on the street and got in the car with them and drove to Jordan Downs. The victim then bought four one-half Sherman cigarettes and they all went to her front yard and smoked some Shermans. The two men they had met then took them to the bus stop where the victim and the defendant got out of the car. The victim said she was broke and that she needed some money for the bus and her child. She suggested they go to a motel where the defendant could pay her for sex. The defendant explained he had no money for a motel and she suggested they go into the abandoned house. They went into the abandoned house and had intercourse. The defendant denies ever using force or threats of force in order to complete the act of intercourse. Two days

later he was arrested and accused of raping the victim.

(Pet. Ex. A at 6-9.)

The District Attorney charged Petitioner with kidnapping with penalty enhancements for use of a deadly weapon and for a prior felony conviction. In addition, Petitioner was charged with two counts of rape with penalty enhancements for use of a deadly weapon and prior felony conviction. On March 17, 1981, Petitioner entered a guilty plea to the rape charge with a penalty enhancement for use of a firearm, and in exchange, Petitioner was promised no more than seven years incarceration. All other charges were continued to the probation and sentencing hearing. While defendant was out on bail awaiting sentencing on the rape charge, he committed another offense, described in the probation officer's August 1982 pre-sentencing investigation report as follows:

> On March 31, 1981, witnesses who were neighbors of the deceased victim, Rebecca Booker, established that the victim had been alive about 9:00 P.M. on that date. While inside the house, a witness observed two television sets, one located in the living room, and the other, a portable type, located in the bedroom. Witness, upon leaving the decedent's house, observed her to be in good health, having no bruises or marks on her body. The following day, April 1, 1981, witness had gone to the victim's home at 11:30 in the morning to advise her she would pay her some money she owed her. Witness knocked on the door and witness's children had told her earlier that the victim was home, having not seen her leave. Witness knocked on the door and called her name; however, there was no answer. Witness then looked through the mail slot, and observed something which appeared to be blankets lying on the floor.
>
> At the time the deceased was killed, Calvin Wallace had been living with the decedent approximately one year at 9724 Evers Street. Mr. Wallace had keys that fit the house, including one key which fit the back door. A steel door covers the wooden door entering the rear of the home, to which Mr. Wallace had one key for the steel door only. All of the windows of the home were covered with steel bars.
>
> On March 26, 1981, in the evening hours, witness Calvin Wallace was stopped for drunk driving, and after his arrest, the witness gave defendant his keys to take his car home to the victim decedent, Rebecca Booker. The keys which he gave the defendant also contained the key to the security door of the house. Witness Wallace was in custody for 90 days subsequent to his arrest for drunk driving, with the exception of a period of seven days when he was out of

4

custody to attend the funeral of his girlfriend. In view of Mr. Wallace's live-in relationship with the decedent, he was able to attest to the fact that three televisions were located in the victim's home, including a floor model television in the living room, a portable model in the bedroom, which had a broken antenna, and a third model located in the kitchen. In addition, the victim owned a Polaroid camera, as well as a small pocket camera. The witness, Wallace, owned a ten-speed, maroon sturdy bicycle. Upon witness Wallace's return to his and the decedent's home, he discovered property missing, which included a .38 snub-nosed revolver, two of the televisions, the two cameras and binoculars. Additionally, witness Wallace's own personal bicycle was missing.

On April 1, 1981, Los Angeles police officers were called to the location of 9724 Evers Street, Los Angeles, at 2:00 P.M., regarding a possible death. Upon officers' arrival, and inspection of the location, they observed no forced entry to the building, and all of the doors and windows were intact, which had been secured by iron bars. The front door was unlocked, including both the wooden and security door. The victim was observed in a prone position, face down on the living room floor and there appeared to be no sign of life. There were lacerations to the left throat area of the victim's neck, and it appeared to be a deep wound. Blood at the scene was located directly beneath the cut on the throat of the victim. The victim appeared to be wearing a light pink robe with red trim, and draped across her right leg was a black jacket with the identification "Cal State, LA" on the left breast of the jacket. Next to the victim's right leg was also a pink pajama bottom which was not on the body. Officer was able to observe bloodstains around the body, and the victim's hair was messed and there were three hair rollers in the front part of the victim's hair.

Upon walking through the location, officer observed one television in the front room which was of a console-type.

On April 1, 1981, sometime between ten and 12 in the morning, witness Leon Hughes, Jr, who had previously been acquainted with the defendant, observed the defendant on a ten-speed bicycle which appeared to be brown in color. The defendant was carrying a pair of binoculars and a camera, the camera appeared to be a Polaroid. The defendant approached witness Hughes and asked if he was interested in the bike or the camera or the binoculars, as they were for sale. The witness stated he was not, and then defendant left on the bicycle, taking the property with him. Witness saw him again later in the day, at approximately 3:00 P.M., across the street, and at this time the defendant was in the back of a pickup truck, and he had a television set in his arms, and started to walk toward witness Hughes. Defendant then offered to sell the television set to the witness for $20, and witness bought it. Witness kept the television set for a couple of weeks, after which time the police came and took it. The television set had a broken antenna.

5

On March 31, 1981, witness Pamela Rene Pitts was at the home of her grandmother on Bandera Street. Witness Pitts, who had known the defendant for approximately two years, and during which time witness Pitts and the defendant were previously involved in a romantic relationship. Witness Pitts' sister is Wanda Taylor, who at the time of the present offense was married to the defendant. On March 31, 1981, when the defendant was at witness Pitts' grandmother's home, he was wearing jeans and a tee-shirt, and was wearing a black jacket with the words "Cal State, LA" on it. He stayed for a short period of time, and then left the location, returning about 10:30 or 11:00 P.M., and was wearing overalls, but did not have on the jacket. When he returned to the house, he was carrying a camera and some binoculars, the camera appearing to be a Polaroid-type camera. Witness Pitts went to bed about 12:30 P.M., and when she did so, the defendant was still in the house. Upon awakening the following morning, about 6:30 A.M, the defendant was gone. She later saw him, about 11:00 A.M. on April 1, 1981, and upon arriving at the grandmother's residence, was wearing a shirt and some jeans, and witness was able to observe some bloodstains on the sleeve of the shirt he was wearing. The bloodstains appeared to be dry. When witness asked him about the bloodstains, the defendant rolled his sleeve up. The defendant left the grandmother's house about 11:30 A.M., and then witness saw him later on in the day, about 2:00 P.M., and when he arrived at the grandmother's residence, he did so on a ten-speed bicycle which witness knew belonged to Calvin Wallace.

DEFENDANT'S STATEMENT:

To date of dictation, defendant has not provided a written account.

Defendant was interviewed in local custody, where he orally related, "Just the jury says it was my sweater near the body . . . I just got a raw deal."

"I had nothing to do with it, but I did have the camera, the binoculars . . . I got them from another guy who asked if I could sell the stuff. I sold them at the liquor store for $50. I borrowed the bicycle from the same friend . . . they say the bike I was riding and all this stuff came from the deceased's house. I don't know the deceased."

"I did have the sweater, I didn't kill no damn body."

(Pet. Ex. C at 6-11.)

On May 21, 1981, Petitioner was sentenced to a determinate term of seven years in prison on the rape charge and related penalty enhancements. On August 4, 1982, following a jury trial on the second set of charges, Petitioner was convicted of first degree murder with penalty enhancements for use of a deadly weapon and a prior violent felony conviction. Petitioner was

6

sentenced on September 28, 1982 to an indeterminate term of twenty-nine years to life in prison with the possibility of parole. This sentence was to be served consecutively to the seven year sentence that Petitioner was already serving due to the aggravated nature of the crime, his extensive adult and juvenile criminal record, history of violent conduct, and the fact that the murder was committed while Petitioner was pending sentencing on the rape charges. Petitioner was received by the California Department of Corrections on October 4, 1982. His life term began on June 27, 1986, and his minimum eligible parole date passed on January 22, 2003. Petitioner was denied parole for a period of four years at his initial parole suitability hearing on February 28, 2002. Petitioner appeared before the Board for his first subsequent parole suitability hearing on February 14, 2007. After considering numerous positive and negative suitability factors, the panel concluded that Petitioner remained an unreasonable risk of danger to society, and thus he was not suitable for parole. Petitioner sought habeas corpus relief in the Los Angeles County Superior Court. On February 5, 2008, the court denied his petition, finding that the Board's determination that Petitioner was unsuitable for parole was supported by some evidence in the record. The California Court of Appeal, Second Appellate District and the California Supreme Court both denied habeas corpus relief without comment. Petitioner filed this federal petitioner for writ of habeas corpus on June 20, 2008. Respondent filed an answer on May 19, 2009, and Petitioner filed his traverse on June 2, 2009.

## IV. APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of *habeas corpus* filed after its enactment on April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997). Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 n. 7 (2000). Federal *habeas corpus* relief is not available for any claim decided on the merits

7

in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). *See also Penry v. Johnson*, 531 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001). This court looks to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).

## V. DISCUSSION

### A.   Due Process in the California Parole Context

Petitioner claims that the Board's determination that he was unsuitable for parole at the time of his 2007 parole suitability hearing was not supported by any relevant, reliable evidence in the record that he posed a current and unreasonable risk of danger to society. Petitioner contends that the facts and circumstances of his commitment offense do not support the Board's conclusion that he posed and unreasonable risk of danger to society. Moreover, rather than relying solely on the commitment offense, Petitioner argues that the Board improperly relied upon Petitioner's unrelated rape conviction in deeming him unsuitable for parole. Petitioner also contends that the Board improperly discounted his 2006 favorable psychological evaluation as "ridiculous" because the evaluator accepted as true Petitioner's claims of innocence regarding both the commitment offense as well as his prior convictions. In addition, Petitioner claims that the Board failed to consider its own power to find Petitioner suitable for parole while placing special conditions, such as abstinence from alcohol use, on his release. Lastly, Petitioner alleges the Board ignored that he had both marketable employment skills and realistic parole plans. Thus, according to Petitioner, the

evidence in the record supports a finding of parole suitability, and the Board's arbitrary decision violated his right to due process of law.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits state action that "deprive[s] a person of life, liberty or property without due process of law." U.S. CONST. AMEND. XIV, § 2. A person alleging a due process violation must first demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. *Ky. Dep't. Of Corrs. v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause itself or from state laws. *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987). In the context of parole,

> [t]here is no right under the Federal Constitution to be conditionally released before the expiration of a valid sentence, and the States are under no duty to offer parole to their prisoners. [ ]. When, however, a State creates a liberty interest, the Due Process Clause requires fair procedures for its vindication – and federal courts will review the application of those constitutionally required procedures.

*Swarthout v. Cooke*, slip. op. at 4 (U.S. January 24, 2011). *See also Greenholtz v. Inmates of Neb. Penal*, 442 U.S. 1, 7 (1979) ("There is "no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."). Here, because California's statutory scheme governing parole "uses mandatory language, [it] 'creates a presumption that parole release will be granted' when or unless certain designated findings are made, thereby giving rise to a constitutionally protected liberty interest." *McQuillion*, 306 F.3d at 901 (quoting *Greenholtz*, 442 U.S. at 12). *See also Swarthout*, slip op. at 4 ("[T]he Ninth Circuit held that California law creates a liberty interest in parole . . . . While we have no need to review that holding here, it is a reasonable application of our cases." (internal citations omitted)).

Despite the existence of this liberty interest, it is well established that inmates are not guaranteed the "full panoply of rights" during a parole suitability hearing as are normally afforded

9

to criminal defendants under the Due Process Clause. *Swarthout*, slip op. at 4 ("In the context of parole, we have held that the procedures required are minimal."). *See also Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). The United States Supreme Court has held that the protection afforded by the federal Due Process Clause to California parole decisions consists solely of the "minimal" procedural requirements set forth in *Greenholtz*, specifically, "an opportunity to be heard and . . . a statement of the reasons why parole was denied." *Id.* at 4-5. *See also Greenholtz*, 442 U.S. at 16.

In addition, as a matter of state constitutional law, denial of parole to California inmates must be supported by "some evidence" demonstrating that the inmate poses an unreasonable risk of danger to society. *Hayward v. Marshall*, 603 F.3d 546, at 562 (citing *In re Rosenkrantz*, 29 Cal.4th 616 (2002)). *See also In re Lawrence*, 44 Cal.4th at 1191 (recognizing the denial of parole must be supported by "some evidence" that an inmate "poses a current risk to public safety"); *In re Shaputis*, 44 Cal.4th 1241, 1254 (2008) (same). However, California's "some evidence" requirement is a substantive right provided by the state of California, and thus is not afforded protection by the federal Due Process Clause. *Swarthout*, slip op. at 5. Indeed, the Supreme Court has held that "[n]o opinion of [theirs] supports converting California's 'some evidence' requirement into a substantive federal requirement." *Id.* Moreover, the Supreme Court has long recognized that alleged violations of state law are not cognizable on federal habeas corpus review. *Id.* at 6; *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (reiterating that "it is not the province of a federal habeas court to reexamine state court determinations on state law questions"); *Smith v. Phillips*, 455 U.S. 209, 221 (1982) ("A federally issued writ of habeas corpus, of course, reaches only convictions obtained in violation of the United States Constitution.").

Here, the record reflects that Petitioner was present at his 2007 parole suitability hearing, that he participated in the hearing, and that he was provided with the reasons for the Board's decision to deny parole. The federal due process clause requires no more. Moreover, to the extent that Petitioner's claim rests on his allegation that the Board failed to follow California

10

1  state law or procedure because its unsuitability determination is not supported by sufficient
2  evidence, it is not cognizable in a federal petition for writ of habeas corpus. *Middleton v. Cupp*, 768
3  F.2d 1083, 1085 (9th Cir. 1986); (*Givens v. Housewright*, 786 F.2d 1378, 1381 (9th Cir. 1986). As
4  discussed above, habeas corpus relief is available under 28 U.S.C. § 2254(a) only on the basis of
5  some transgression of federal law binding on the state courts. *Middleton*, 768 F.2d at 1085;
6  *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983). Petitioner has received all process he was
7  due and is thus not entitled to federal habeas corpus relief on his claim that the Board's unsuitability
8  determination violated his federal right to due process of law.

**B.    Unsuitability Factors**

Petitioner makes several claims regarding the constitutionality of the relevant sections of the California Code of Regulations and the California Penal Code governing parole suitability determinations. Petitioner first claims that section 3041(b) of the California Penal Code limits the factors permissibly considered by the Board in parole suitability determinations solely to the gravity of the commitment offense. Accordingly, unless the Board concludes "that the gravity of the current or past convicted offense or offenses [ ] is such that consideration of the public safety requires a more lengthy period of incarceration for this individual," a parole release date must be set. CAL. PENAL § 3041(b). Petitioner claims, therefore, that the Board improperly relied upon additional factors irrelevant to the gravity of his commitment offense, including, *inter alia,* his juvenile convictions, arrests which did not result in convictions, his mother's nervous breakdown, his limited relationship with his family, and various psychological factors in finding him unsuitable for parole. In considering factors outside of the commitment offense, Petitioner contends that the Board improperly enlarged the scope of information it is permitted by section 3041 to consider in making a parole suitability determination. This is essentially an argument that the Board violated the California Penal Code in deeming him unsuitable for parole, and is thus a matter of state law. Because federal habeas corpus relief may be granted only for a violation of the Constitution or laws of the United States, this claim is not addressed herein. 28 U.S.C. § 2254(a). *See also Estelle v.*

11

*McGuire*, 502 U.S. 62, 67-68 (1991) (holding that federal habeas corpus relieve is not available to remedy alleged errors of state law).

   Petitioner next claims that the suitability and unsuitability criteria set forth in the California Code of Regulations are void because they violate the separation of powers doctrine by encroaching on the power of the California legislature to determine parole eligibility for specific convicted offenses. *See* 15 CAL. CODE REGS. § 2402. It is unclear, however, whether Petitioner is claiming that the Board has violated the separation of powers doctrine under the federal or state constitution. Regardless, Petitioner's claim must fail. A claim that the Board violated the federal constitution is not cognizable because the federal doctrine of separation of powers does not extend to the states under the Fourteenth Amendment. *See Hughes v. Superior Court*, 339 U.S. 460, 467 (1950) ("[T]he Fourteenth Amendment leaves the States free to distribute the powers of government as they will between their legislative and judicial branches."). Thus, Petitioner cannot claim that the federal separation of powers doctrine applies to the Board's actions as the Board is a state agency. A claim that the Board violated the separation of powers doctrine contained in the California state constitution does not give rise to a claim for federal habeas corpus relief. *See Middleton v Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985).

   Petitioner also claims that the Board's reliance on the gravity of an inmate's commitment offense to revoke that inmate's parole eligibility is unconstitutional because it is based on a capital murder special circumstance, that the crime was especially heinous, atrocious or cruel. According to Petitioner, this circumstance must be proven to a jury beyond a reasonable doubt because it increases the punishment for an inmate's commitment offense. The rule referenced by Petitioner stems from *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, which established that "under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence [than the statutory maximum] must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely a preponderance of the evidence." *Cunningham v. California*, 549 U.S. 270, 281 (2007). *See also Blakely v. Washington*, 542 U.S. 296 (2005). The relevant statutory

maximum "'is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Id*. at 275.  Here, Petitioner stands convicted of first degree murder, and that conviction carries a statutory maximum sentence of life imprisonment. CAL. PENAL CODE § 190.  Therefore, no additional facts must be found beyond those which were found by the jury at Petitioner's trial, and the Board's determination that Petitioner was not suitable for parole did not increase the punishment, which is up to life imprisonment, for Petitioner's commitment offense.

In addition, Petitioner is mistaken with regard to the role the Board plays in parole suitability determinations.  An inmate serving an indeterminate life sentence becomes eligible for parole after serving a minimum period of confinement. *In re Dannenberg*, 34 Cal.4th 1061, 1078 (2005).  Such inmates may serve up to life in prison, but may be released on parole if they are deemed suitable by the Board after considering a variety of relevant and reliable factors bearing on their current dangerousness. *See* 15 Cal. Code Regs §§ 2402 and 2281.  The Board's unsuitability determination does not, therefore, revoke an inmate's eligibility for parole.  Under certain circumstances, however, it is possible that indeterminately sentenced inmates eligible for parole may nonetheless never be deemed suitable for parole if the Board determines that they remain an unreasonable risk of danger to society.

Petitioner next claims that the Board construes every indeterminately sentenced inmate's commitment offense as "especially heinous, atrocious, or cruel," and there is thus no meaningful standard by which to narrow the class of persons to whom this factor applies.  This appears to be a claim that title 15, section 2402 of the California Code of Regulations, which governs parole suitability determinations for murderers is unconstitutionally vague.[2]  Generally, a regulation is void for vagueness "if it fails to give adequate notice to people of ordinary intelligence

---

[2] Title fifteen, section 2402 of the California Code of Regulations is identical to section 2281. *In re Shaputus*, 44 Cal.4th at 1257 n.13.  The only difference is that section 2402 governs parole suitability determinations for murderers and attempted murderers while section 2281 governs life prisoners convicted of crimes other than murder or attempted murder.

13

1   concerning the conduct it proscribes or if it invites arbitrary and discriminatory enforcement."
2   *United States v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989). *See also Humanitarian Law Project*
3   *v. Mukasey*, 509 F.3d 1122, 1134 (9th Cir. 2007) ("To survive a vagueness challenge, the statute
4   must be sufficiently clear to put a person of ordinary intelligence on notice that his or her
5   contemplated conduct is unlawful."); *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998)
6   (A statue must be sufficiently clear so as to allow persons of ordinary intelligence a reasonable
7   opportunity to know what is prohibited.). "[A] party challenging the facial validity of [a law] on
8   vagueness grounds outside the domain of the First Amendment must demonstrate that the enactment
9   is impermissibly vague in all of its applications." *Hotel & Motel Ass'n of Oakland v. City of*
10  *Oakland*, 344 F.3d 959, 972 (9th Cir. 2003) (internal quotations omitted).  Moreover, "[t]he Due
11  Process Clause does not require the same precision in the drafting of parole release statues as is
12  required in the drafting of penal laws." *Hess v. Bd. of Parole and Post-Prison Supervision*, 514 F.3d
13  909, 914 (9th Cir. 2008) (citing *Glauner v. Miller*, 184 F.3d 1053, 1055 (9th Cir. 1999)).  The statute
14  need only make a "principled distinction" between those who are suitable for parole and those who
15  are not. *Id*.

16     Petitioner's claim must fail because it ignores the five sub-factors set forth for the
17  Board's consideration in determining whether an inmate's commitment offense was "especially
18  heinous, atrocious, or cruel."  These factors are enumerated in section 2402(c)(1)(A)-(E), and
19  include: (A) whether multiple victims were attacked, injured or killed in the same or separate
20  incidents; (B) whether the offense was carried out in a dispassionate and calculated manner; (C)
21  whether the victim was abused, defiled or mutilated during the offense; (D) whether the offense was
22  carried out in a manner demonstrating an exceptionally callous disregard for human life; and (E)
23  whether the motive for the crime was very trivial in relation to the offense.  15 Cal. Code Regs §
24  2402(c)(1)(A)-(E).  Because a finding that an inmate's commitment offense is "especially heinous,
25  atrocious, or cruel" is further limited by these five detailed factors, it does not appear to be
26  unconstitutionally vague. *See Arave v. Creech*, 507 U.S. 463, 470-78 (1993) (Idaho death penalty

statute which cited as an aggravating factor that the crimes were carried out in "utter disregard for human life" was not impermissibly vague because limiting construction had been adopted defining this factor as demonstrating "the utmost disregard for human life, i.e., the cold-blooded pitiless slayer"). Even if the challenged language were unconstitutionally vague, which it is not, the Board's reliance on multiple factors, other than factors related to the commitment offense, would still provide "some evidence" to support the Board's decision. *See Sass*, 461 F.3d at 1128-29. Accordingly, Petitioner's challenge to the constitutionality of section 2402 on vagueness grounds is without merit.

## VI. CONCLUSION

IT IS RECOMMENDED that Petitioner's petition for writ of habeas corpus be DENIED. These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In any objections he elects to file petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: February 4, 2011

*/s/ Charlene H. Sorrentino*
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE

15